Laura Sixkiller (Bar No. AZ-022014)
laura.sixkiller@us.dlapiper.com
Sean Newland (Bar No. CA-300928)
   (*pro hac vice* forthcoming)
sean.newland@us.dlapiper.com
**DLA PIPER LLP (US)**
2525 East Camelback Road, Suite 1000
Phoenix, Arizona 85016-4232
Tel:  480.606.5100
Fax: 480.606.5101
DLAPHX@us.dlapiper.com

*Attorneys for Plaintiff*
*Cadence Bank f/k/a BancorpSouth Bank*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

## TUCSON DIVISION

| | |
|---|---|
| Cadence Bank f/k/a BancorpSouth Bank, a Mississippi corporation, <br><br> Plaintiff, <br><br> v. <br><br> Heritage Family Offices, L.L.P., an Arizona limited liability partnership, <br><br> Defendant. | CASE NO. <br><br> **COMPLAINT** |

Plaintiff Cadence Bank f/k/a BancorpSouth Bank[1] ("Plaintiff"), through its counsel, brings this action against Defendant Heritage Family Offices, L.L.P. ("Defendant").

## NATURE OF THE ACTION

1. The trade secret misappropriation archetype is: Company A hires Employee and gives her access to Company A's confidential and proprietary business information and trade secrets. Employee ends her employment and misappropriates Company A's confidential

---

[1] On October 29, 2021, BancorpSouth Bank acquired Cadence Bank by merger. As a result of the merger BancorpSouth Bank changed its name to Cadence Bank.

and proprietary business information and trade secrets. Company B then hires Employee—and Company B and Employee use Company A's confidential and proprietary business information and trade secrets to wrongfully compete with Company A.

2. The facts underlying this action track that archetype.

3. Plaintiff hired Zachary Thomas ("Thomas") to provide investment services to its customers and, through his employment with Plaintiff, Thomas had access to Plaintiff's confidential and proprietary business information and trade secrets, including but not limited to customer lists with detailed, non-public information Plaintiff expended substantial effort to develop to give Plaintiff a competitive advantage over its competitors, amounts Plaintiff charges customers and earns, and Plaintiff's internal policies and confidential information, which gives Plaintiff an advantage over its competitors, including Defendant and Thomas.

4. On information and belief, before Thomas left his employment with Plaintiff, Defendant had already arranged to hire Thomas. Defendant and Thomas then used the confidential and proprietary business information and trade secrets Thomas took, with Thomas using the information to solicit Plaintiff's employees to join Defendant, all with Defendant's knowledge and/or support, for its benefit, and in violation of agreements and policies Thomas made and agreed to follow.

5. Defendant's actions in concert with Thomas unambiguously give rise to claims for misappropriation of trade secrets, intentional interference with contractual relations and business expectancies, aiding and abetting Thomas' breach of fiduciary duty and conversion, unjust enrichment, unfair competition, and civil conspiracy. Defendant should be held liable for its misdeeds and the damages that its conduct has caused and continues to cause to Plaintiff and its business.

## THE PARTIES

6. Plaintiff Cadence Bank f/k/a BancorpSouth Bank is a Mississippi corporation with its principal place of business in Tupelo, Mississippi. Plaintiff's corporate headquarters is in Houston, Texas.

7. On information and belief, Defendant Heritage Family Offices, L.L.P. is an Arizona limited liability partnership whose General Partners are Arizona citizens.

## JURISDICTION AND VENUE

8. The Court has subject matter jurisdiction under 28 U.S.C. § 1332 because this is a civil action where the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.

9. The Court also has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff seeks relief for Defendant's violation of 18 U.S.C. § 1836, and the Court therefore may exercise supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367 because they are so related to Plaintiff's claim under 18 U.S.C. § 1836 that they form part of the same case or controversy under Article III of the United States Constitution.

10. Venue is proper in this Court under 28 U.S.C. § 1391 because Defendant and its General Partners reside in the District of Arizona.

## FACTUAL ALLEGATIONS

11. Plaintiff is a financial services company. As part of its comprehensive and full-service platform, Plaintiff offers wealth management and financial advisory services to its customers. Part of Plaintiff's business is to provide investment and financial advice to clients through its wealth management team. At the relevant time, that was Infinex Investments, Inc. ("Infinex"), Plaintiff's former broker-dealer with whom Plaintiff participated as a subscriber under an Investment Services Agreement. During the period relevant to this action, Infinex acted as broker-dealer for Plaintiff's registered agents, supervising and sponsoring their advising services in accordance with the Financial Industry Regulatory Authority and applicable law.

12. Under the Investment Services Agreement, certain employees of Plaintiff enter into a Registered Representative Agreement ("Agreement") with Infinex, in which Plaintiff ("Subscriber" in the Agreement) is identified as a third-party beneficiary of the Agreement.

13. In the Agreement, the employee agrees that they will not "be interested, directly or indirectly, in any manner, as a partner, officer, director, stockholder, advisor, employee or in any other capacity, in any other business similar to Infinex's business or allied trade...."

14. Employees who execute the Agreement further agree as follows:

(8) (a) You agree that, except at the direction of Infinex, you will not, at any time, during or after the term of this Agreement, either directly or indirectly, divulge, disclose or communicate any trade secrets learned by you in connection with your engagement as an Infinex Representative. Trade secrets shall mean any information concerning any matters relating to the affairs or business of Infinex, including without limiting the generality of the foregoing, the names and addresses of any Infinex customers, information concerning such Infinex customers' accounts or portfolios, or any other information concerning the business of Infinex, its manner of operation, its plans or other data. This paragraph shall not apply if Subscriber continues to offer investment products through its own broker dealer, investment adviser or insurance agency, *or* another third-party marketing firm, and you continue to be employed or otherwise associated with Subscriber.

(b) You agree that all memoranda, notes or records compiled by you, or made available to you, during the term of this Agreement concerning the business of Infinex, Subscriber or any account or portfolio of any Infinex customer, are confidential business records and shall be delivered by you to Infinex upon the termination of your association with Infinex or at any other time at Infinex's request, and that none of such records, nor any part of them, is to be removed from the Branch, either in original form or in duplicated or copies or electronic form, and that the names, addresses and other facts in such records are not to be transmitted verbally or otherwise utilized by you except as necessary in the ordinary course of conducting business for Infinex.

(c) Except as required in connection with the performance of your duties as an Infinex Representative as contemplated hereunder, you agree that, during your engagement under this Agreement and for a period of one (1) year thereafter, you will not, either directly or indirectly, for your own account or as an agent, servant, employee, officer, director, shareholder, partner, member or manager of any entity, or member of any firm, or participant in any venture:

(i) induce any person employed by or associated with Infinex, Subscriber, or any of their affiliates to leave such employment or association;

(ii) engage, hire, employ or solicit the employment or engagement of any employee or independent contractor of Infinex, Subscriber or any of their affiliates, other than on behalf of Infinex, Subscriber or any of their affiliates; or

-4-

(iii) solicit the securities brokerage, investment advisory or insurance business of, or otherwise contact, any customer whose name became known to you as a direct or indirect result of your engagement as an Infinex Representative.

. . .

(d) You recognize that the foregoing limitations are reasonable and properly required for the adequate protection of the business of Infinex and Subscriber, and that in the event any such limitation is deemed to be unreasonable by a court of competent Jurisdiction, then you agree to submit to the reduction of said limitation as said court shall deem reasonable.

(e) The provisions of this paragraph 8 shall survive the termination of this Agreement and of your engagement hereunder, irrespective of the reason therefor.

(f) You agree and acknowledge that Subscriber is an intended third party beneficiary of your obligations under this paragraph 8 and that, although not a signatory to this Agreement, Subscriber shall be entitled to enforce your obligations hereunder.

(g) You understand that if you violate any of the provisions of this paragraph 8 you may be liable to Infinex and/or Subscriber for any damage caused thereby. Further, you understand that the breach of any of the provisions of this paragraph 8 could result in irreparable injury to Infinex and/or Subscriber for which monetary damages may be insufficient, and that Infinex and Subscriber are entitled to commence an action in a court of competent jurisdiction seeking to enforce such provisions by obtaining an injunction or order for specific performance.

15. In addition to their obligations under the Agreement, Plaintiff's employees are required to follow the terms of Plaintiff's Code of Business Conduct and Ethics Policy (the "Code of Conduct"), which provides, in part, as follows:

Both during and after employment with the Company, each employee shall strictly protect and maintain the confidential or proprietary character of all Confidential Information (as defined below) and not allow such information to be given to or appropriated by third parties or otherwise used or disclosed contrary to Company policy. No employee shall, during or after termination of an employee's employment, directly or indirectly, use (for the benefit of employee or the benefit of another) or disclose any Confidential Information except as may be necessary for the performance of employee's duties to the Company. Each employee agrees, as part of their employment with the Company, to promptly notify the Company if the employee becomes aware of or suspects any unauthorized use or disclosure of any Confidential Information by himself/herself or anyone else.

"Confidential Information" means all technical and business information (including but not limited to financial statements and related books and records, personnel records, customer lists, customer information, terms of dealings and arrangements with customers and suppliers, manuals and reports) of the Company which is of a confidential or proprietary character. "Confidential Information" further means any and all information, whether or not originated by the Company which is used in the Company's business and is: (1) proprietary to, about or created by the Company; (2) gives the Company some competitive business advantage or the opportunity of obtaining such advantage or the disclosure of which could be detrimental to the interests of the Company; (3) designated as Confidential Information by the Company, or from all the relevant circumstances should reasonably be assumed to be confidential and proprietary to the Company; or (4) not generally known outside the Company. Such Confidential Information includes, but is not limited to, the following types of information and other information of a similar nature (whether or not reduced to writing or designated as confidential):

- *Work Product.* Loan customer lists or portfolios, lists of depositors, books of business, actual, former or prospective client lists, work product resulting from or related to work or projects performed or to be performed for the Company or for clients of the Company. This includes any customers assigned to employee or whose accounts employee services as well as any customer relationships employee develops, enhances, supports or maintains while employed at the Company. Confidential information also includes but is not limited to the interim and final lines of inquiry, hypotheses, research and conclusions related thereto and the methods, processes, procedures, analysis, techniques and audits (both internal and external) used in connection therewith and all attorney client opinions and privileged communications;

- *Trade Secrets.* Formula, pattern, compilation, program, device, method, technique, or process, that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy;

- *Computer Software.* Computer software of any type or form in any stage of actual or anticipated research and development, including but not limited to programs and program modules, routines and subroutines, processes, algorithms, design concepts, design specifications (design notes, annotations, documentation, flowcharts, coding sheets, and the like), source code, object code and load modules, programming, program patches, hardware configurations and system designs;

- *Other Proprietary Data.* Information relating to the Company's proprietary rights prior to any public disclosure thereof, including but not limited to the nature of the proprietary rights, production data, technical and engineering data, test data and test results, the status and details of research and development of products and

-6-

services, and information regarding acquiring, protecting, enforcing and licensing proprietary rights (including patents, copyrights and trade secrets);

- *Business Operations*. Internal personnel and financial information, vendor names and other vendor information (including vendor characteristics, services and agreements), purchasing and internal cost information, internal services and operational manuals, and the manner and methods of conducting the Company's business;

- *Marketing and Development Operations*. Marketing and development plans, price and cost data, price and fee amounts, pricing and billing policies, quoting procedures, marketing techniques and methods of obtaining business, forecasts and forecast assumptions and volumes, and future plans and potential strategies of the Company which have been or are being discussed; and

- *Personally Identifiable Information.* All information that pertains to an identified or reasonably identifiable consumer. The term generally can include both public and non-public information, regardless of the circumstances under which Cadence acquires the information.

All employees are expected to recognize that records of the Company also constitute Confidential Information, and these records do not become any less confidential or proprietary to the Company because an employee may commit some of them to memory or because an employee may otherwise maintain them outside of the Company's offices.

All employees are expected to recognize that Confidential Information of the Company is to be used solely and exclusively for the benefit of the Company. Further, all employees are expected to keep such Confidential Information confidential and not to divulge or disclose this information except for that purpose, both during their employment with the Company and after that employment ceases. Upon termination of employment, regardless of the reason, employees must immediately return to the Company all records and Confidential Information, including information maintained by said employee in his/her office, personal electronic devices, and/or at home.

By reading this Code or receiving compensation from the Company each employee acknowledges and agrees that their obligation to preserve Confidential Information continues after that employee ceases to work for the Company.

Employees may have individual agreements that further expand upon the definition and restrictions on the use or disclosure of Confidential Information.  Nothing contained in this document is intended to limit or restrict those agreements.

16. On April 29, 2019, Plaintiff hired Thomas as a First Vice President and Associate Financial Advisor to provide investment services to its customers.

17. Thomas executed the Agreement when Plaintiff hired him and was and remains bound by restrictive covenants in the Agreement—including the provisions outlined above.

18. Thomas is also aware of the requirements set forth within the Code of Conduct, having completed three trainings on the Code of Conduct, on or around November 1, 2019, August 13, 2020, and September 8, 2021.

19. Thomas resigned his employment position with Plaintiff on or around June 24, 2022. Either before, upon, or shortly thereafter, Thomas became an employee of Defendant. Defendant directly competes with Plaintiff as both Defendant and Plaintiff offer brokerage and investment services for their customers and perform the same, or substantially the same, functions connected with the banking, financial services, and investment industry.

20. After he ended his employment relationship with Plaintiff (if not before), Thomas contacted certain of Plaintiff's employees to induce them to leave their employment with Plaintiff, or to solicit them for employment with Defendant. For example, on June 27, 2022, Thomas contacted an employee of Plaintiff with whom he previously worked to discuss transitioning and planned to follow up with the employee once he could share his new employer's name.

21. Thomas also solicited Plaintiff's customers to move business from Plaintiff and to Thomas or Defendant. For example, on June 24, 2022, the same day Thomas submitted his resignation, he scheduled a meeting with one of Plaintiff's customers for June 29, 2022, at her home, since they could not "meet at the bank" and conveying to the customer that he no longer worked for Plaintiff, while making disparaging statements about Plaintiff.

22. As additional examples, on June 27, 2022, Thomas contacted another client of Plaintiff and again conveyed negative statements about Plaintiff, communicating to the client his intention of leaving his position with Plaintiff to join Defendant. This was done for the purpose of inducing the client to move their account from Plaintiff to Defendant. Then, on June 28, 2022, after the date of his resignation, Thomas contacted Plaintiff to try

and stop a transaction for an investing client whom Thomas said was moving its business with Thomas to Defendant.

23. Thomas' willful and intentional violations of his Agreement with Plaintiff has injured and continues to injure Plaintiff. Plaintiff has lost revenue generated by managing the assets of customers Thomas lured away with Defendant, and the negative statements that Thomas made about Plaintiff to Plaintiff's customers, with Defendant's knowledge or at its direction, diminished Plaintiff's business goodwill and reputation.

24. On or about June 27, 2022, Plaintiff's counsel sent a letter to Thomas outlining Plaintiff's concerns and Thomas' violations of the Agreement and immediate need to cease and desist his conduct. Thomas did not respond.

25. With Thomas refusing to honor his obligations, Plaintiff had no choice but to seek injunctive relief against Thomas in state court in the State of Texas. Plaintiff received a preliminary injunction ("PI") against Thomas on July 1, 2022, which, among other things, prohibited Thomas from contacting or soliciting Plaintiff's customers. That PI was extended several times, and a temporary restraining order ("TRO") against Thomas and others acting in concert with Thomas, including Defendant, was issued on August 29, 2022. The TRO is effective until the earlier of June 24, 2023, or trial on the merits, and enjoins:

    a. Inducing employees of Plaintiff to leave their employment with Plaintiff or engaging, hiring, employing, or soliciting their employment or engagement;

    b. Soliciting the securities brokerage, investment advisory, or insurance business of any customer of Plaintiff or Infinex whose name became known to Thomas as a direct or indirect result of his employment with Plaintiff;

    c. Divulging, disclosing, or communicating trade secrets Thomas learned through his position as an Infinex representative, including the names and addresses of customers of Infinex or Plaintiff, customer accounts or portfolio information, or any other information about Infinex's business, including its operations, plans, or data; but not information Thomas knew independent of his employment with Plaintiff; and

   d. Destroying or deleting any electronic or other documents, evidence, or records related to matters implicated by the Texas lawsuit or otherwise pertaining to Plaintiff, including but not limited to all call logs, text messages, hard drives, backups, archives, and other possible sources of stored metadata or information.

26. Defendant indicated through counsel that it was aware of the TRO in the Texas action and acknowledged the following provision thereof: "This order shall be binding and effective upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise, including Zachary Thomas's current employer, Heritage Family Offices, LLP."  Accordingly, Plaintiff does not currently seek a temporary restraining order and preliminary injunction here to protect its trade secrets and confidential and proprietary business information from harm caused by Defendant and Thomas' conduct but reserves the right to do so later if the TRO lapses and otherwise ceases to be effective as to Defendant.

## FIRST CAUSE OF ACTION

### (Defend Trade Secrets Act, 18 U.S.C. § 1836)

27. Plaintiff incorporates paragraphs 1-26 as if fully set forth herein.

28. Defendant's actions complained of herein constitute misappropriation of trade secrets as defined by the Defend Trade Secrets Act, 18 U.S.C. § 1836.

29. Defendant wrongfully acquired Plaintiff's confidential, proprietary, and trade secret information by hiring Thomas—who had access to such information while employed by Plaintiff, and who misappropriated such information upon resigning that employment.

30. The confidential, proprietary, and trade secret information Defendant acquired includes, but is not limited to, customer lists (with detailed, non-public customer information Plaintiff expended substantial effort to develop that gives Plaintiff a competitive advantage over Defendant and other industry competitors), amounts Plaintiff charges its customers and earns on the book of business Defendant and Thomas misappropriated, and certain internal policies and private business information that gives Plaintiff an advantage over competitors (hereafter referred to collectively as Plaintiffs "Trade Secrets").

31. On information and belief, Defendant knew such information was acquired and intended to be used for improper means and encouraged and supported the misappropriation. Defendant and Thomas are now using Plaintiff's confidential, proprietary, and trade secret information to target Plaintiff's banking, financial services, and investment industry clients and convince the clients to end their relationships with Plaintiff and transition to Defendant.

32. As a direct and proximate result of Defendant's and its employee Thomas' conduct, Plaintiff suffered damage as provided in this Complaint. On information and belief, that conduct was occasioned by bad faith and greed, ill will and an evil mind as Defendant and its employee Thomas sought to steal and profit from Plaintiff's confidential, proprietary, and trade secret information.

33. Remedies sought by Plaintiff include compensatory damages (in an amount to be proven at trial), exemplary damages of double compensatory damages, punitive damages, its reasonable attorneys' fees and other litigation costs reasonably incurred, and such further equitable and injunctive relief the Court deems appropriate.

## SECOND CAUSE OF ACTION

**(Arizona's Uniform Trade Secrets Act, A.R.S. § 44-401 *et seq.*)**

34. Plaintiff incorporates paragraphs 1-33 as if fully set forth herein.

35. Plaintiff's Trade Secrets legally qualify and are protected as trade secrets within the meaning of Arizona's Uniform Trade Secrets Act, A.R.S. § 44-401, *et seq.*

36. The Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable by proper means by the public or other persons who could obtain commercial or economic value from its disclosure.

37. Plaintiff took reasonable efforts to maintain the secrecy of the Trade Secrets, but Thomas had access to them through his employment with Plaintiff and, acting in concert with Defendant, misappropriated them and disclosed them to Defendant.

38. Defendant knew, had reason to know, or expressly intended, the Trade Secrets received from Thomas had been inappropriately derived, and by virtue of the actions above, misappropriated and used Plaintiff's Trade Secrets in the operation of its business.

39. As a direct and proximate result of the misappropriation of the Trade Secrets, Plaintiff has been damaged and will continue to be damaged in an amount to be proven at trial.

40. Defendant's conduct was willful and malicious. Therefore, in addition to actual damages, Plaintiff is entitled to recover exemplary damages pursuant to A.R.S. § 44-403.

41. Plaintiff is entitled to recover attorneys' fees and costs under A.R.S. § 44-404.

### THIRD CAUSE OF ACTION

**(Intentional Interference with Contractual Relations and Business Expectancies)**

42. Plaintiff incorporates paragraphs 1-42 as if fully set forth herein

43. On or about April 29, 2019, Thomas entered into the Agreement, under which he served as a dual employee of Plaintiff and Infinex. Plaintiff is a third-party beneficiary of the Agreement. Thomas agreed Plaintiff can enforce his obligations under the Agreement.

44. Plaintiff gave Thomas access to confidential information—including the Trade Secrets—and training, referrals, and resources to support his business development while he was employed by Plaintiff. Plaintiff also supported and paid Thomas' tuition at Texas A&M Financial Planning School. Thomas signed an agreement to remain in Plaintiff's employ for two years after the tuition payments, which he breached by resigning to join Defendant.

45. Thomas had no clients or accounts when he began work for Plaintiff. Plaintiff's training and support, including internal referrals Plaintiff provided, were critical to Thomas' professional development. Plaintiff helped educate Thomas and build his book of business.

46. The Agreement has confidentiality and non-solicitation terms. In Paragraph 8, Thomas covenanted he would not divulge, disclose, or communicate trade secrets he learned as an Infinex Representative. Paragraph 8(a) defines "trade secrets" to include, among other things, the Trade Secrets Defendant and Thomas misappropriated. The Agreement requires Thomas to return all confidential business records on his separation from employment, and during and for one year after his employment, to not directly or indirectly induce any person employed by or associated with Plaintiff or Plaintiff's affiliates to leave such role; to engage, hire, employ, or solicit the employment and/or engagement of any employee or independent

contractor of Plaintiff or Plaintiff's affiliates; or solicit the securities brokerage, investment advisory, or insurance business of, or otherwise contact, any customer whose name became known to Thomas as a direct or indirect result of his position as an Infinex Representative.

47.     Soon after his employment with Plaintiff ended, and within the 12-month non-solicitation period, Thomas became an employee of Defendant, Plaintiff's direct competitor.

48.     As agreed in the Agreement, the Agreement's limitations put on Thomas were reasonable and imposed no greater restraint than is necessary to protect Plaintiff's business interests. The non-solicitation clause is in place for only 12 months and is reasonably tailored to prevent activities that will injure Plaintiff through direct or indirect competition.

49.     As outlined above, Thomas breached the Agreement in several ways, including by soliciting Plaintiff's customers and prospective customers by immediately contacting the customers on leaving his employment with Plaintiff, and soliciting Plaintiff's employees by immediately contacting these employees on leaving his employment with Plaintiff. Thomas' breach injured Plaintiff, causing lost profits and business goodwill (past and future) and the value of confidential or proprietary information, including the Trade Secrets.

50.     On information and belief, Defendant had knowledge of the Agreement (and of Thomas' other agreements with Plaintiff such as Thomas' post-tuition payment employment agreement) and Thomas obligations thereunder. Defendant also had knowledge of business expectancies Plaintiff had with current and prospective customers, the revenue generated by those customers, and the time, money, and resources Plaintiff invested in those customers.

51.     Defendant, through the actions described above, intentionally interfered with, induced, and/or caused Thomas to breach the Agreement and other agreements Thomas and Plaintiff entered, and interfered with business expectancies Plaintiff had with its current and prospective customers. Defendant's conduct damaged Plaintiff (in the form of lost business of customers that transitioned business to Defendant and revenues associated with business expectancies of current and prospective customers) in amounts to be proven at trial.

52. Defendant's conduct was willful, purposeful, in bad faith, and designed to harm Plaintiff for its benefit with an evil mind and intent. Therefore, in addition to actual damages, Plaintiff is entitled to punitive damages.

## FOURTH CAUSE OF ACTION

### (Aiding and Abetting Breach of Fiduciary Duty)

53. Plaintiff incorporates paragraphs 1-52 as if fully set forth herein.

54. Through the acts outlined in this Complaint, Thomas breached fiduciary duties he owed to Plaintiff, and on information and belief, Defendant knew or reasonably should have known Thomas was breaching those fiduciary duties to Plaintiff at the time of Thomas' breaches, and on or about June 30, 2022, Plaintiff served Defendant a letter advising of Thomas' obligations and his violations of the Agreement.

55. Defendant gave substantial assistance or encouragement to Thomas to breach his fiduciary duties by and through the conduct alleged in this Complaint.

56. As a direct and proximate result of Defendant's aiding, abetting, and providing substantial assistance in furtherance of Thomas' breach of his fiduciary duties, Plaintiff has suffered and will continue to suffer damages in an amount to be proven.

57. Defendant's conduct was willful, purposeful, in bad faith, and meant to advance its interests ahead of Plaintiff's. Therefore, in addition to actual damages, Plaintiff is entitled to recover punitive damages.

## FIFTH CAUSE OF ACTION

### (Aiding and Abetting Conversion)

58. Plaintiff incorporates paragraph 1-57 as if fully set forth herein.

59. As alleged, Thomas wrongfully exercised dominion and control over Plaintiff's property—including the Trade Secrets. Defendant knew, or reasonably should have known, Thomas wrongfully converted Plaintiff's property at the time Thomas converted the same.

60. Defendant gave substantial assistance or encouragement to Thomas to convert Plaintiff's property for their own uses by and through the conduct alleged in this Complaint.

61. As a direct and proximate result of Defendant's aiding, abetting, and providing substantial assistance in furtherance of the conversion of Plaintiff's property, Plaintiff has suffered damages in an amount to be proven at trial.

62. Defendant's conduct was willful, purposeful, in bad faith, and meant to obtain a benefit for itself at Plaintiff's expense, with an evil mind and intent. Therefore, in addition to actual damages, Plaintiff is entitled to recover punitive damages.

## SIXTH CAUSE OF ACTION

### (Unjust Enrichment)

63. Plaintiff incorporates paragraphs 1-62 as if fully set forth herein.

64. Defendant has improperly and without justification retained various assets that rightfully belong to Plaintiff, including proprietary and confidential business information, the Trade Secrets, and profits from client accounts transitioned from Plaintiff to Defendant.

65. Through Defendant's conduct alleged, Plaintiff has been unjustly injured and Defendant has been unjustly enriched.

66. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has suffered damages in an amount to be proven at trial.

67. Defendant's conduct was willful, purposeful, in bad faith, and intended to harm Plaintiff, for its own benefit and with an evil mind and intent. Therefore, in addition to actual damages, Plaintiff is entitled to recover punitive damages.

## SEVENTH CAUSE OF ACTION

### (Unfair Competition/Misappropriation)

68. Plaintiff incorporates paragraphs 1-67 as if fully set forth herein.

69. Plaintiff invested significant time, money, and additional resources developing its proprietary and confidential business information, exclusive of its trade secrets.

70. Defendant's actions described in this Complaint, including, without limitation, improperly procuring, possessing, and using Plaintiff's property and confidential business information without authorization was for the purpose of advancing and providing an unfair competitive advantage to Defendant's rival business interest.

71. Defendant's actions have caused and continue to cause harm to Plaintiff.

72. Defendant is therefore liable for such harm in an amount to be proven at trial.

73. Defendant's conduct was willful, purposeful, in bad faith, and intended to harm Plaintiff for its own benefit, all with an evil mind and intent. Therefore, in addition to actual damages, Plaintiff is entitled to recover punitive damages.

## EIGHTH CAUSE OF ACTION

### (Civil Conspiracy)

74. Plaintiff incorporates paragraphs 1-73 as if fully set forth herein.

75. As alleged, Defendant and Thomas have agreed to and engaged in a conspiracy among themselves with the unlawful purpose of misappropriating and converting Plaintiff's Trade Secrets and other confidential and proprietary business information and property.

76. Defendant, among other actions in furtherance of the conspiracy:

   A. Knowing Thomas was subject to non-solicitation and other requirements under the Agreement, allowed Thomas to access its systems to establish client profiles;

   B. Facilitated Thomas' communications with Plaintiff's customers to seek authorizations to transfer their accounts to Defendant;

   C. Knowing of the Agreement's requirements and Plaintiff's efforts to enforce them, accepted transfer of client assets; and

   D. On information and belief, agreed to accept the client transfers on terms and conditions mirroring, either in full or in relevant part, the terms and conditions the client received with Plaintiff and under the Agreement.

77. As a direct and proximate result of Defendant's wrongful conduct, Plaintiff has been damaged and will continue to be damaged in an amount to be proven at trial.

78. Defendant's conduct was willful, purposeful, in bad faith, and with an evil mind and intent. Therefore, in addition to actual damages, Plaintiff is entitled to recover punitive damages.

**PRAYER FOR RELIEF**

Plaintiff respectfully prays for the following relief against Defendant:

A.   All actual and consequential damages in an amount to be proven at trial;

B.   For punitive and/or exemplary damages;

C.   For attorneys' fees and costs incurred herein;

D.   For pre- and post-judgment interest at the legal rate from the date of judgment until paid in full;

E.   For an Order permanently enjoining Defendant from:

   i.   Inducing employees of Plaintiff to leave their employment with Plaintiff in violation of the Agreement, or to breach his or her employment agreement with Plaintiff;

   ii.   Engaging, hiring, employing, or soliciting employment or engagement of any of Plaintiff's employees in violation of the Agreement;

   iii.   Soliciting the securities brokerage, investment advisory, or insurance business of, or otherwise contacting, customers of Infinex or Plaintiff who became known to Defendant as a direct or indirect result of Thomas' employment with Plaintiff; and

   iv.   Divulging, disclosing, or communicating the Trade Secrets of Infinex or Plaintiff—including names and addresses of customers of Infinex or Plaintiff, information concerning such customer's accounts or portfolios, or any other information concerning the business of Infinex or Plaintiff, including its manner of operation, its plans, or other data.

F.   For an Order to provide Plaintiff a full and complete accounting of all customer accounts that transferred from Plaintiff to Defendant on or after June 24, 2022, including but not limited to the values of those accounts at the time of transfer and the accounting and amounts earned by Defendant and Thomas on those accounts.

G.   For any other relief the Court deems just.

**DEMAND FOR JURY TRIAL**

Plaintiff respectfully demands trial by jury on all claims properly triable to a jury.

| | |
|---|---|
| Dated: March 10, 2023 | **DLA PIPER LLP (US)** |
| | By: */s/ Laura Sixkiller* |
| | Laura Sixkiller |
| | Sean Newland (*pro hac vice* forthcoming) |
| | 2525 East Camelback Road, Suite 1000 |
| | Phoenix, Arizona 85016-4232 |
| | Tel:  480.606.5100 |
| | Fax: 480.606.5101 |
| | laura.sixkiller@us.dlapiper.com |
| | sean.newland@us.dlapiper.com |
| | |
| | *Attorneys for Plaintiff* |
| | *Cadence Bank f/k/a BancorpSouth Bank* |